UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | | |
|---|---|---|
| JAMES MOUNSEY, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| vs. | ) | Case No.  4:14-CV-01633-AGF |
| | ) | |
| ST. LOUIS IRISH ARTS INC., et al., | ) | |
| | ) | |
| Defendants. | ) | |

## MEMORANDUM AND ORDER

This matter is before the Court on the motion of Defendants St. Louis Irish Arts,

Inc. ("SLIA") and its president, Helen Gannon, for summary judgment.  Plaintiff James

Mounsey, a white male, alleges that Defendants discriminated against him because his

romantic partner was a black male, and retaliated against him for complaining of

discrimination.  Plaintiff, who is proceeding pro se,[1] asserts discrimination and retaliation

claims under 42 U.S.C. § 1981 and the Missouri Human Rights Act ("MHRA"), Mo.

Rev. Stat. §§ 213.010-213.137.  For the reasons set forth below, the Court will grant

Defendants' motion for summary judgment.

## BACKGROUND

Viewing the facts and all reasonable inferences in the light most favorable to

---

[1]     Plaintiff was initially represented by counsel, but on October 14, 2015, the Court
granted Plaintiff's counsel's unopposed motion to withdraw, and at Plaintiff's request,
stayed this case for 30 days to allow Plaintiff time to retain new counsel.  Plaintiff did not
retain new counsel within that time frame and has since proceeded pro se.

Plaintiff, for purposes of this summary judgment motion, the record establishes the following. SLIA is the local branch of the Comhaltas Ceoltoiri Eireann ("CCE"), an organization seeking to preserve and promote traditional Irish music, dance, and culture. Gannon, a white female, is the president of SLIA and owner of St. Louis Irish Arts School (the "School"), an Irish dance school operated by SLIA. Gannon runs the School with help from a group of unpaid volunteers.

In the spring of 2012, Defendants agreed to sponsor Plaintiff on an H-1B worker visa to teach at the School. Plaintiff was already in the United States, working as a lecturer at the University of Missouri-St. Louis ("UMSL"), under a J-1 visa that was due to expire soon. Under the H-1B visa sponsored by SLIA, Plaintiff could continue to lecture at UMSL and other institutions as a representative of SLIA, while also teaching at the School. SLIA, by its attorneys, submitted Plaintiff's visa application in May 2012.

Plaintiff asserts in his unverified complaint that SLIA required him to work far greater hours than those represented in his visa application and that he was not paid for the additional hours worked, and for that reason, Plaintiff filed a wage-and-hour complaint with the Department of Labor (the "DOL"). It is unclear from the record when the DOL complaint was filed, but the DOL completed its investigation on or about June 27, 2014, and found that SLIA owed Plaintiff back wages in the amount of $9,464.25, for the period covering April 7, 2012, to February 22, 2014.

The parties dispute how many employees SLIA employed while Plaintiff worked there (from 2012 to 2013). On May 15, 2012, Gannon signed, under penalty of perjury

and as part of her visa application for Plaintiff, a petition indicating that SLIA had six current employees in the United States.  However, in an affidavit in this case, Gannon states that SLIA paid only five teachers, including Plaintiff, at any given time in 2012 and 2013.  Gannon also states in her affidavit that SLIA's teachers were independent contractors rather than employees.  In support of this statement, Gannon asserts that, when the DOL investigated Plaintiff's wage-and-hour complaint, the DOL concluded that all of SLIA's teachers except Plaintiff were independent contractors rather than employees.[2]

In June 2012, Gannon learned that Plaintiff was in a romantic relationship with Napoleon Owens, a black male unaffiliated with SLIA.  Plaintiff emailed Gannon on June 23, 2012, asking Gannon to keep her knowledge of Plaintiff's relationship with Owens private and thanked Gannon for her discretion.

On July 3, 2012, Gannon sent an email to Plaintiff stating that she was "upset" that Plaintiff brought Owens to a rehearsal for a concert that had taken place the night before. Gannon stated that Owens "had no business being there" and that Gannon had "never accepted teachers bringing their date to work."  (Doc. No. 39-4 at 11.)  Gannon further stated that the director of the concert hall had asked her if the "black kid" (referring to Owens) sitting in the lobby was part of her group.  Gannon asked that Plaintiff keep his "personal life outside [her] school" and stated:

---

[2]     Defendants insist that Plaintiff is an independent contractor, too, but state that for purposes of this motion, they accept the DOL's finding that Plaintiff was an employee.

Your relationship with Napoleon is causing a distraction in your work and in the school. I am having second thoughts on your future involvement with the school for many reasons. This is a new situation for me. I have a lot of home schooled families who are very conservative and may want to explain sexually [sic] when they are ready and not because they see or hear something around the school.

You have made some grave decisions very very quickly which will affect every aspect of your life. Flaunting them and forcing us to accept them will have consequences out of your control. We love you dearly like a son and that gives me the liberty of telling you how I feel.

*Id.*

Over the next few months, SLIA finished the visa process on Plaintiff's behalf, and Plaintiff's H-1B visa was issued on September 28, 2012, with an expiration date of September 30, 2015. (Doc. No. 45-1.)

On March 21, 2013, Plaintiff sent an email to Gannon complaining of two incidents that occurred in his Irish dance class. The first was that before class, he heard one student "sniggering to [her friend] about a black kid who was walking down the street outside SLIA," and the second was that, during class, another student shouted "Napoleon!" as an example for the letter "N" while practicing the Irish alphabet. (Doc. No. 39-3 at 18.) Gannon responded: "This is so sad. I had hoped your private life would remain private. I am not sure how to deal with it but I will find a way. Napolean [sic] has become familiar to the school which I wanted to avoid and take it slowly. We will work it out but I am grateful you told me about it." *Id.* at 17-18. In a further email exchange the same day, Gannon asked that Plaintiff let her deal with the students and agreed that what went on in the class was "totally unacceptable." *Id.* at 17. Plaintiff

4

responded the next day, thanking Gannon for "all the support and acceptance" and agreeing to let Gannon know about and handle any similar behavior in the future.  *Id.*

On April 2, 2013, Plaintiff sent an email to Gannon describing another incident with his students.  Plaintiff stated that he reprimanded the students' use of cell phones during class, which he found disruptive and rude.  Plaintiff yelled at the students and ultimately confiscated the students' cell phones.  Gannon responded that, although she agreed Plaintiff must be respected as a teacher, one of the students was very upset about the incident and Plaintiff should have come to Gannon sooner with the issue.  Gannon stated that she did "not understand why [Plaintiff] chose to handle whatever happened without consulting [Gannon]" and that the incident "reflect[ed] very badly on the school."  (Doc. No. 39-3 at 19.)

On September 15, 2013, Plaintiff sent Gannon a letter addressed to the SLIA board regarding Plaintiff's role with the School during the upcoming fall semester.  In the letter, Plaintiff stated that he wanted to update the board on the changes in his "circumstances and working capacity" for the fall semester, and specifically that his "situation personally, professionally, medically and financially [had] all changed dramatically."  (Doc. No. 39-4 at 6.)  Plaintiff stated that his "family in Ireland [had] undergone huge personal difficulties" in the past year; that he "had to put [his] PhD on hold as [he was] unable to deal with all of the stresses that full time study demands along with the other difficulties faced"; that his salary at UMSL remained at $6,000 a year, on which he could not live, and did not include health benefits; that he felt that his "working

5

role at SLIA went above and beyond the role of 'teacher,'" and he could no longer assist with things like "websites, paperwork, presentations, grant applications, publications"; and that he could not return to teaching the group dance classes, which he described as a "negative classroom environment," because the "level of resentment, undermining and lack of support in dealing with discipline and personal issues ha[d] made it far too upsetting for [him]." *Id.* With regard to the group dance classes, he stated:

> I feel it unfair to be corrected and demeaned in front of these wonderful students. My personal life is to remain outside the classroom and the school. I will not have my personal life commented on or viewed as a "negative" impact on the school. I have a right as an employee, a person and an individual to not be judged on my sexual orientation.

*Id.* He ended the letter by stating that he wished to continue to teach Irish language, private dance lessons, and harp ensemble if the SLIA board desired. *Id.*

On September 26, 2013, Gannon offered Plaintiff the opportunity to teach an Irish language class at SLIA for the fall 2013 semester, which would allow Plaintiff to continue working for SLIA and to maintain his visa. Gannon stated that the class would be held on Mondays at 7 p.m. and that Plaintiff would be paid $50 per class night. But Gannon stated that if the attendance numbers dropped "too low," SLIA may need to reevaluate whether to continue the language class. (Doc. No. 39-3 at 21.) Gannon asked Plaintiff to keep her informed of cancellations and to keep attendance each night. *Id.*

In early October 2013, Plaintiff took a set of Irish drums from the School without permission for use at a kindergarten class he taught at another facility. Plaintiff returned most, if not all, of the drums approximately one month later, upon Gannon's request; the

parties dispute whether one of the drums was missing.

On October 24, 2013, Joel Glassman, Director of UMSL's International Studies and Programs, emailed Gannon to ask whether Plaintiff still worked for SLIA because he had heard "indirectly" that Plaintiff did not, which would mean that Plaintiff was no longer permitted to work for UMSL. Gannon responded that, while Plaintiff was not teaching the Irish dance class, he was teaching other programs at SLIA, including an Irish language class. Glassman replied to this email on October 28, 2013, thanking Gannon for her update and stating that he met with Plaintiff a few days prior, at Plaintiff's request, and had received an update from Plaintiff as well. Gannon emailed Plaintiff the same day asking him to communicate with her and inquiring about what he told Glassman about his relationship with SLIA. According to Defendants, Plaintiff never informed them what he told Glassman about his relationship with SLIA or how he portrayed SLIA to the institutions at which he taught as a SLIA representative.

Defendants assert that Plaintiff canceled several of the six scheduled Irish language classes he was supposed to teach in the fall 2013 semester, and that he canceled at least one class without notice to Gannon or the students. In support of this allegation, Gannon provides her affidavit, stating that Plaintiff never gave her any information on the Irish language classes he held or canceled, and that Plaintiff never provided a list of enrolled students. Defendants also cite an email Gannon sent to Plaintiff on October 28, 2013, asking Plaintiff to inform Gannon ahead of time of class cancellations because a student named Jennifer did not know the last week's class was canceled and had waited

in a hallway for 30 minutes for class to start.  (Doc. No. 39-4 at 15.)  Plaintiff generally

denies these allegations and cites two emails in support of his denial.  The first is an

email he sent to Gannon and a student named Randy on November 11, 2013, stating that

there would not be any language class that night on account of a holiday.  The second is

an email he sent to Gannon the next day, November 12, 2013, stating that he did not

inform the whole class of the November 11 cancellation because he believed the other

students were not able to attend that class in any event.  In this email, Plaintiff also

provided Gannon a list of the four students enrolled in the Irish language class.  (Doc.

No. 45-4.)

On December 2, 2013, SLIA asked Plaintiff to sign a Memorandum of

Understanding, which Defendants assert was necessary because of Plaintiff's ongoing

lack of communication with them.  This Memorandum stated that it would "clarify and

detail" Plaintiff's relation and obligations to SLIA.  The Memorandum stated that SLIA

would continue to support Plaintiff's employment and visa sponsorship until May 31,

2014, in return for Plaintiff agreeing to the following stipulations:

1) you will fulfill your obligations with [UMSL and two other institutions
   at which Plaintiff taught through his affiliation with SLIA];

2) as the holder of a visa sponsored by SLIA, you agree to represent SLIA,
   CCE, their leadership and board members, in the best possible terms at
   all times;

3) you will not discuss this agreement or any aspect of your relationship
   with SLIA, its president, or any of its board members with anyone,
   either in the US, Ireland, or elsewhere;

4) you will not post or write anything which may appear in any form of printed or social media or the internet either as a result of direct action by you or as a result of an action by a third party, whether on your behalf of not.

(Doc. No. 39-4 at 25.) The Memorandum stated that Plaintiff's failure to comply with any of the foregoing would result in the immediate termination of this agreement and of SLIA's commitment to sponsor Plaintiff's visa. *Id.* Plaintiff did not sign the Memorandum.

On December 6, 2013, Plaintiff filed a charge of discrimination with the Missouri Commission on Human Rights ("MCHR") and the Equal Employment Opportunity Commission ("EEOC"), alleging discrimination based on race by association and sex.[3] Plaintiff also alleged retaliation based on his September 15, 2013 letter to Defendants, which he described as a complaint about the "hostile work environment created by the response to [him] dating a black man." (Doc. No. 39-3 at 16.)

On December 15, 2013, Gannon emailed another teacher at the School, Shannon Flecke, and copied the attorney who is representing Defendants in this lawsuit. In the email, Gannon informed Flecke that she was "free to send any emails directly to [the lawyer] to help us clear up this Mess." (Doc. No. 39-4 at 39.) It is unclear from the record what "Mess" Gannon was referencing, and Gannon does not address or provide context for this email in her affidavit. Flecke responded the next day, copying the lawyer, and stating that Plaintiff used "offensive racial slurs" and had engaged in

---

[3] Plaintiff has not asserted a claim of discrimination on the basis of sex in this lawsuit.

inappropriate communications on social media with a female former SLIA student, who was a teenager at the time. Flecke also attached screenshots of the social media messages between Plaintiff and the former student. *Id.* In the social media messages,[4] Plaintiff stated that he was "picking up the black talk" and stated "yeaa nigger 'ooh noo yu diddennn," to which the student replied "um no," and later, "haha." *Id.* at 40-41. In response to the student's comments that one of her teachers favored her, Plaintiff stated "no wonder you got good grades!!! Lol one word …… SLUT" and added a smiley face. The student responded "haha hey now! I mean he is gay so it won't do me much now. lol." *Id.* at 42.

On December 17, 2013, Defendants sent a letter to UMSL and two other institutions at which Plaintiff taught through SLIA, stating that SLIA was no longer affiliated with Plaintiff and would revoke its sponsorship of his visa.

On February 20, 2014, Defendants notified Plaintiff by letter that they were terminating their relationship with him and revoking his visa sponsorship. Defendants assert that they delayed this formal termination for a couple of months because Plaintiff's wage-and-hour complaint with the DOL was still pending at the time.

In their termination letter, signed by Gannon, Defendants stated, in relevant part:

> As you know, we repeatedly attempted to communicate with you about your duties for [SLIA] for the Fall 2013 and Spring 2014 semesters. You failed to communicate your intentions with respect to your involvement with the organization. You also failed to deliver the class registration list

---

[4] These messages appear to be dated in the year 2013, but the screenshot is not clear enough for the Court to identify the month or date.

for the Fall Irish Language class as requested and failed to provide the requested documentation showing which students attended the class on which nights. Finally, you failed to sign the Memorandum of Understanding about your behavior and conduct while acting on behalf of SLIA. We therefore consider you to have abandoned your relationship with SLIA effective December 2013. Despite our efforts to contact you, we heard nothing further from you, so we took no steps to schedule you for any activities or classes for the Spring 2014 semester.

Furthermore, since our last direct communications, the Board of Directors has been informed that you have had inappropriate communications with students and former students, both verbally on school premises and via Facebook. We have completed our investigation of those incidents in sufficient detail to allow us to conclude that, given SLIA's trusted role in the lives of its students, we simply cannot allow the potential for our students to be exposed to such conduct by anyone associated with the organization. Therefore, [SLIA] will have no relationship with you for any future programs or associate with you in any manner in the future. In light of your job abandonment, however, this development would seem to be of no consequence as you have no ongoing relationship with SLIA.

Please be advised that SLIA is in the process of notifying the appropriate government officials that it no longer wishes to sponsor your H1-B Visa due to your decision to discontinue your job duties.

(Doc. No. 39-4 at 8.)

Plaintiff received a right-to-sue letter on June 6, 2014, and filed this lawsuit in state court on August 8, 2014. Plaintiff alleges race discrimination and retaliation claims under § 1981 and the MHRA. In his complaint, Plaintiff alleges that his romantic association with a black man and his complaint of discrimination, both in his September 15, 2013 letter and in his charge of discrimination, were motivating factors in the following adverse actions: SLIA's failing to pay him full wages, asking him to sign the Memorandum of Understanding, and ultimately terminating him and revoking his visa

sponsorship.   Defendants removed the case to this Court on September 19, 2014.

## ARGUMENTS OF THE PARTIES

In their motion for summary judgment, Defendants argue, first, that SLIA is not an "employer" under the MHRA because it employs fewer than six employees, and as such, Plaintiff's MHRA discrimination and retaliation claims fail as a matter of law.  Next, Defendants argue that all of Plaintiff's claims fail on the merits because Plaintiff has provided neither direct evidence of intentional discrimination nor evidence creating a reasonable inference of discrimination.

Defendants argue that, with respect to the first alleged adverse action, paying Plaintiff less than full wages, Plaintiff's compensation structure was set up before Defendants were aware of Plaintiff's relationship with Owens, so the compensation terms could not have been motivated by discriminatory animus.

Likewise, Defendants argue that the record lacks direct or indirect evidence that Plaintiff's partner's race motivated the remaining adverse actions—Defendants' decisions to present Plaintiff with the Memorandum of Understanding and to later terminate Plaintiff and revoke his visa sponsorship.  Defendants argue that these decisions were motivated by legitimate reasons unrelated to Plaintiff's partner's race, namely:  Plaintiff voluntarily limited his job duties and refused to accept assignments; had difficulty interacting with SLIA students; improperly handled student disciplinary incidents; canceled several dates of the single class he agreed to teach during the fall of 2013; would not communicate with SLIA regarding representations made to outside entities

regarding SLIA; took property from SLIA without permission; and participated in inappropriate communications with a  former SLIA student on social media, which Defendants assert violated child protection policies by which SLIA was bound as a member of CCE.

Further, Defendants argue that Plaintiff cannot prove the elements of his retaliation claims.  Defendants argue that the only statutorily protected activity Plaintiff engaged in was his December 6, 2013 charge of discrimination.  Defendants dispute Plaintiff's assertion that his September 15, 2013 letter to Defendants qualified as a protected activity because the letter contains no reference to Plaintiff's partner's race.

Defendants argue that Plaintiff cannot show any causal connection between his protected activity—his charge of discrimination—and the alleged adverse employment actions of failing to pay Plaintiff his full wages, presenting Plaintiff with the Memorandum of Understanding, and ultimately terminating Plaintiff and revoking his visa sponsorship.  Defendants note that they set up Plaintiff's compensation structure and presented him with the Memorandum of Understanding before Plaintiff filed his charge of discrimination, thus precluding any causal connection between these actions and the charge.  Defendants further argue that they warned Plaintiff in the Memorandum of Understanding itself that they would terminate him and revoke his visa sponsorship if he failed to agree and comply with the Memorandum, which demonstrates that the (conditional) decision to carry out these actions, too, was made before Plaintiff filed his charge of discrimination.

13

Finally, Defendants argue that even if Plaintiff's September 15, 2013 letter constituted protected activity, Defendants' later actions were not causally connected to any complaint of discrimination contained in the letter but instead flowed from Plaintiff's history of problematic behavior and lack of communication as discussed above.

Plaintiff has not submitted a brief in response to Defendants' motion, but instead relies on a response to Defendants' statement of facts, a statement of additional facts, and documentary exhibits which are largely duplicative of the exhibits submitted by Defendants.

In his response to Defendants' statement of facts and in his own statement of additional facts, both of which are unsworn and unattested, Plaintiff asserts that, apart from the emails between Gannon and him discussed above, Gannon also "blackmailed, harassed and demeaned plaintiff due to the race of his partner; utilized Plaintiff's "association with Owens and [Owens's] race as a factor in [an] explanation given" for refusing to provide Plaintiff with proof of employment;  and, on various occasions, referred to particular students as a "little bit of color" and made derogatory statements about black taxi drivers and medical professionals.  (Doc. No. 41 at 6, 10, 11.)  Plaintiff does not cite any evidence in support of these assertions.

Plaintiff further contends that he was at various times "reprimanded due to the race of his partner and was told that he would not be accepted in the school or by its parents and board," that he was "referred to as the 'fallen man'" in reference to his "relationship with a black man," and that "[r]acial slurs and references to 'nigger brown'

and 'gollywog'" were used in front of Owens. *Id.* at 7, 11. Plaintiff does not identify who made these comments and does not cite any evidence in support of these assertions.

Plaintiff also argues (again, without citing evidence) that he sent the September 15, 2013 letter to Defendants because of the threatening environment at SLIA and because he was being "benched" following disciplinary conversations with Gannon "where the race of Plaintiffs [sic] partner was referenced." (Doc. No. 41 at 7.) He argues that other SLIA teachers' partners were welcomed and celebrated in the School. As an example, Plaintiff cites an email invitation to a bridal shower for a teacher hosted by SLIA on June 2, 2013. Finally, Plaintiff asserts that it has been difficult to prove his allegations because, shortly after December 2013, his CCE email account was shut down and made inaccessible to him.

In reply, Defendants generally argue that Plaintiff's response is based solely on unsworn allegations rather than admissible evidence. Defendants admit that they hosted a bridal shower for an employee and that "SLIA generally welcomed and celebrated the partners of its teachers, including Plaintiff's partner." (Doc. No. 51 at 5.) However, Defendants argue that Plaintiff has not provided evidence that Defendants allowed any teacher to bring his or her partner or date to work or otherwise treated any similarly situated teacher differently than Plaintiff. Defendants also deny that they (rather than CCE) had any control over Plaintiff's CCE email account, and Defendants note that Plaintiff provided no evidentiary support for his unsworn assertion that Defendants shut down the email account.

**<u>DISCUSSION</u>**

"Summary judgment is appropriate when, viewing the facts in the light most favorable to the non-movant, there are no genuine issues of material fact and the movant is entitled to judgment as a matter of law." *Metro. Prop. & Cas. Ins. Co. v. Calvin*, 802 F.3d 933, 937 (8th Cir. 2015) (citation omitted). In opposing summary judgment, a plaintiff may not "simply point to allegations" in the complaint, *Howard v. Columbia Pub. Sch. Dist.*, 363 F.3d 797, 800 (8th Cir. 2004), or "rest on the hope of discrediting the movant's evidence at trial," *Matter of Citizens Loan & Sav. Co.*, 621 F.2d 911, 913 (8th Cir. 1980). Rather, the plaintiff "must identify and provide evidence of specific facts creating a triable controversy." *Howard*, 363 F.3d at 800 (citation omitted). "'Where the record taken as a whole could not lead a rational trier of fact to find for the nonmoving party, there is no genuine issue for trial.'" *Torgerson v. City of Rochester*, 643 F.3d 1031, 1042 (8th Cir. 2011) (en banc) (quoting *Ricci v. DeStefano*, 557 U.S. 557, 586 (2009)).

**<u>Defendants Status as "Employers" Under the MHRA</u>**

As an initial matter, the Court finds that questions of fact preclude it from determining, on summary judgment, whether Defendants are "employers" as that term is defined under the MHRA. *See* Mo. Rev. Stat. § 213.010(7) (defining "employer" as including "any person employing six or more persons within the state, and any person directly acting in the interest of an employer"). Even accepting Gannon's assertion in her affidavit that the DOL found that almost all of SLIA's teachers were independent

16

contractors, Defendants have not cited, and the Court has not found, authority suggesting that the DOL's finding would be binding on the Court in interpreting the MHRA. Indeed, Missouri courts interpret the word "employee" more broadly under the MHRA than in other contexts. *See Howard v. City of Kansas City*, 332 S.W.3d 772, 780-81 (Mo. 2011) (refusing to apply a common-law agency approach to interpreting "employee" under the MHRA and instead applying a "dictionary definition" of "employee" as "any worker who is under wages or salary to an employer and who is not excluded by agreement from consideration as such a worker"). The parties have not submitted evidence as to the wages, salary, or employment agreements (if any) of SLIA's teachers other than Plaintiff.

And as to Defendants' assertion that, in any event, SLIA paid only five teachers at any one time in 2012 and 2013, in light of Gannon's prior sworn statement in her 2012 visa application that SLIA had six employees at the time, the Court finds there is a question of fact as to whether SLIA employed six or more persons (not limited to teachers), during the relevant time periods. Therefore, the Court will turn to the merits of Plaintiff's MHRA and § 1981 claims.

**Section 1981 and MHRA Race Discrimination Claim (Counts II and III)**

Section 1981 "affords a federal remedy against discrimination in private employment on the basis of race." *Johnson v. Ry. Exp. Agency, Inc.*, 421 U.S. 454, 460, (1975). Likewise, the MHRA makes it an unlawful employment practice for an employer to (a) "discharge any individual, or otherwise to discriminate against any individual with

respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race."  Mo. Rev. Stat. § 213.055.1(1).

Defendants do not dispute that § 1981 and the MHRA encompass race discrimination claims of the type alleged by Plaintiff here, based on the race of Plaintiff's romantic partner who was not employed by Defendants.  Although the parties have not cited, and the Court has not found, Eighth Circuit or Missouri precedent on this specific issue, the Court, too, will assume that such claims are cognizable under § 1981 and the MHRA as associational race discrimination claims.  *See Rosenblatt v. Bivona & Cohen, P.C.*, 946 F. Supp. 298, 300 (S.D.N.Y. 1996) ("It is well-settled that a claim of discrimination based on an interracial relationship or association is cognizable under Section 1981.") (citing cases from other circuit courts of appeal); *Chandler v. Fast Lane, Inc.*, 868 F. Supp. 1138, 1143–44 (E.D. Ark. 1994) ("A white person's right to associate with African–Americans is protected by § 1981.") (citing cases from other jurisdictions); Mo. Rev. Stat. § 213.070(4) (making it an unlawful employment practice to "discriminate in any manner against any other person because of such person's association with any person protected by this chapter").

To survive a motion for summary judgment on a § 1981 race discrimination claim, "a plaintiff must either present admissible evidence directly indicating unlawful discrimination, or create an inference of unlawful discrimination under the burden-shifting framework established in *McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 93

S.Ct. 1817, 36 L.Ed.2d 668 (1973)."  *Macklin v. FMC Transp., Inc.*, 815 F.3d 425, 427 (8th Cir. 2016) (citations omitted).

"To prove intentional discrimination through direct proof [under § 1981], a plaintiff must establish a specific link between the alleged discriminatory animus and the challenged decision, sufficient to support a finding by a reasonable fact finder that an illegitimate criterion actually motivated the employer's decision."  *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014) (citation and quotations omitted).  Absent such direct evidence, the *McDonnell Douglas* framework applies.  Under this framework, a plaintiff must establish a prima facie case, showing that (1) he is a member of a protected class; (2) he was qualified to perform his duties; (3) he suffered an adverse employment action; and (4) circumstances give rise to an inference of discrimination, for example because similarly situated employees, who are not members of the protected group, were treated more favorably.  *Young v. Builders Steel Co.*, 754 F.3d 573, 577 (8th Cir. 2014).

"Once a plaintiff successfully establishes a prima facie case, the burden then shifts to the employer to articulate a legitimate, non-discriminatory reason for the adverse employment action."  *Id.* at 577-78.  "If the employer meets its burden, the presumption of discrimination disappears, and plaintiff is required to prove the proffered justification is merely a pretext for discrimination."  *Id.*

With respect to this burden-shifting framework, "an employer has the right to assign work, to change an employee's duties, to refuse to assign a particular job, and to

discharge—for good reason, bad reason, or no reason at all, absent intentional discrimination." *McLaughlin v. Esselte Pendaflex Corp.*, 50 F.3d 507, 512 (8th Cir. 1995) (citation omitted). Thus, "[t]he showing of pretext necessary to survive summary judgment requires more than merely discrediting an employer's asserted reasoning for terminating an employee." *Roeben v. BG Excelsior Ltd. P'ship*, 545 F.3d 639, 643 (8th Cir. 2008). "A plaintiff must also demonstrate that the circumstances permit a reasonable inference of discriminatory animus." *Id.* "Put another way, [an employee] is required to show that racial discrimination, not [the employer's] stated reasons, 'actually motivated' [the employer] to terminate his employment." *Smith v. United Parcel Serv.*, No. 15-1487, 2016 WL 3726032, at *3 (8th Cir. July 12, 2016) (citation omitted).

The *McDonnell Douglas* framework does not apply to an MHRA claim, which requires only that a plaintiff demonstrate (1) he suffered an adverse employment action; (2) race was a contributing factor in that adverse action, and (3) he incurred damages as a direct result. *Denn v. CSL Plasma, Inc.*, 816 F.3d 1027, 1032-33 (8th Cir. 2016) (citing *Daugherty v. City of Maryland Heights*, 231 S.W.3d 814, 820 (Mo. 2007)). While the MHRA's "contributing factor" standard is "less rigorous than the 'motivating factor' standard employed in federal discrimination cases," *id.*, it still requires a showing that race "contribut[ed] a share in" or "ha[d] a part in producing the effect" of the adverse action, *Lomax v. DaimlerChrysler Corp.,* 243 S.W.3d 474, 482 (Mo. Ct. App. 2007).

Plaintiff has failed to present evidence that would support a reasonable inference that the race of his romantic partner contributed in any way to the adverse actions taken

against him here.  Thus, both his federal and state law discrimination claims fail as a matter of law.

With respect to Defendants' first adverse action, paying Plaintiff less than full wages, although it is unclear when Plaintiff first complained about his wages, the DOL investigation concluded he was underpaid beginning, at the latest, in April 2012.  There is no evidence that Defendants even knew of Plaintiff's relationship with Owens at that time.  Rather, the record establishes that Defendants did not learn of Plaintiff's relationship with Owens until June 2012.  Therefore, there can be no link between Plaintiff's wage structure and any discriminatory animus on the basis of Owens's race.

The remaining adverse actions—presenting Plaintiff with the Memorandum of Understanding and later terminating Plaintiff and revoking his visa sponsorship—were made more than a year and a half after Gannon learned of Plaintiff's relationship with Owens.  And Plaintiff has not offered any admissible direct or circumstantial evidence linking these actions to any prohibited race discrimination under § 1981 or the MHRA. Indeed, the only evidence in the record of references to Plaintiff's partner's race are references made by non-parties, including a concert hall director and a student in Plaintiff's class.  There is no evidence that Gannon or any other SLIA decisionmaker made or adopted any remarks about Plaintiff's partner's race.   Gannon's emails may allude to Plaintiff's sexual orientation, but not the race of Plaintiff's partner.

Some of Plaintiff's allegations in his response to Defendants' statement of facts and in his own statement of additional facts might have supplied evidence of

discrimination, such as Plaintiff's allegations that Gannon "blackmailed, harassed and demeaned plaintiff due to the race of his partner," and "benched" him following disciplinary conversations "where the race of [his] partner was referenced." (Doc. No. 41 at 6, 7.) But the Court cannot consider these unsworn and unattested statements because they do not constitute competent evidence that can be used to defeat a motion for summary judgment. *See Banks v. John Deere and Co.*, No. 15-2058, 2016 WL 3769553, at *5 (8th Cir. July 14, 2016) (refusing to consider on summary judgment a plaintiff's statements regarding the race-based harassment he suffered because the statements were not contained in a sworn affidavit or signed and dated declaration certified as true and correct "under penalty of perjury" as required under Federal Rule of Civil Procedure 56); *Beyer v. Firstar Bank, N.A.,* 447 F.3d 1106, 1108 (8th Cir. 2006) (holding that a defendant was entitled to summary judgment where the plaintiff relied on an unverified complaint and did not submit a sworn affidavit or other admissible evidence from which a reasonable jury could conclude that he had shown one of the elements of his claims).

Even crediting Plaintiff's assertion that his CCE email account was made inaccessible to him, Plaintiff could have submitted a sworn affidavit, a declaration certified as true and correct under penalty of perjury, a verified complaint, or other admissible evidence in support of his allegations. While pro se pleadings are to be construed liberally, a pro se litigant is not excused from complying with the federal rules. *Bennett v. Dr Pepper/Seven Up, Inc*., 295 F.3d 805, 808 (8th Cir. 2002). And Plaintiff at no time sought relief from the Court regarding any inability to obtain discovery.

Excluding Plaintiff's unsupported allegations, the evidence of record does not give rise to an inference of discrimination, even under the lower "contributing factor" standard of the MHRA. Plaintiff has not identified, for example, any similarly situated employee who was treated differently[5] or otherwise demonstrated a connection between Defendants' actions and any animus whatsoever based on Plaintiff's partner's race.

Indeed, after first learning of Plaintiff's relationship with Owens, Defendants completed the process to sponsor Plaintiff for a visa and employed him for another eight months without apparent incident. When Plaintiff eventually complained to Gannon about his students' racial comments in March 2013, Gannon agreed the students' behavior was unacceptable, Plaintiff complimented Gannon's response, and Plaintiff continued to be employed by Defendants for many more months without adverse action. Even after Plaintiff sent his September 15, 2013 letter regarding his desire to reduce his work responsibilities, Defendants accommodated Plaintiff's request and allowed him to remain employed and keep his visa active by teaching an Irish language class.

Defendants did not take any adverse action until December 2, 2013, when they asked Plaintiff to sign the Memorandum of Understanding just a little over a month after

---

[5]     Plaintiff's evidence that Defendants once held a bridal shower for an employee, alone, does not show that Defendants treated a similarly situated employee differently. *Chappell v. Bilco Co.*, 675 F.3d 1110, 1119 (8th Cir. 2012) (holding that, to give rise to a prima facie inference of discrimination, similarly situated employees must be "similarly situated in all relevant respects," considering "the conduct of the employees and any disparity in their discipline").

Plaintiff failed to respond to Gannon's email inquiring about how Plaintiff was representing his relationship with SLIA to UMSL. There is no evidence that this action was in any way linked to a discriminatory animus based on Owens's race.

The record is instead replete with evidence that Defendants presented Plaintiff with the Memorandum of Understanding, and after Plaintiff refused to sign it, terminated Plaintiff and revoked his visa sponsorship, because of Plaintiff's failure to respond to Defendants' inquiries regarding how he represented SLIA to the institutions where he taught as a SLIA representative; his failure to regularly and timely communicate regarding the Irish language class; and his other problematic behaviors, such as inappropriately (in the view of Defendants) disciplining students and taking Defendants' property off the premises without permission. These actions constitute legitimate, non-discriminatory reasons for requiring Plaintiff to agree, by way of the Memorandum of Understanding, to fulfill his obligations with SLIA and represent SLIA in the best light possible, and for terminating Plaintiff and revoking his visa sponsorship when Plaintiff failed to do so. *See Smith*, 2016 WL 3726032, at *4 (recognizing that legitimate, non-discriminatory reasons for adverse employment actions may include an employee's "history" of problematic behavior at a company and his "unwilling[ness] to acknowledge those problems and commit to change").

The Memorandum of Understanding may have gone further than necessary (for example, by prohibiting Plaintiff from discussing any aspect of his relationship with SLIA with anyone and from posting anything on social media or the internet), but for

purposes of his race discrimination claim, Plaintiff must show that Defendants' decision to present him with the Memorandum, and to terminate him and revoke his visa sponsorship after he failed to sign the Memorandum, was not merely a bad decision but was a decision connected in some way to racial animus. *See Smith*, 2016 WL 3726032, at *4 ("Smith's behavior might not be viewed by some employers as a basis for termination. But Smith does not provide evidence to show these reasons were merely rationalizations to cover for racial discrimination.").

As discussed above, the record is devoid of evidence that the race of Plaintiff's partner played any role in Defendants' actions for purposes of a prima facie § 1981 claim or an MHRA claim. And even if the Court assumed Plaintiff could establish a prima facie case under § 1981, Plaintiff has failed to show pretext. Therefore, the Court will grant Defendants' motion for summary judgment on Plaintiff's § 1981 and MHRA race discrimination claims.

## Section 1981 and MHRA Retaliation Claims (Counts I and IV)

Section 1981 retaliation claims are analyzed under the same framework as discrimination claims. A plaintiff must either present direct evidence of retaliation or create an inference of retaliation under the *McDonnell Douglas* framework. *Pye v. Nu Aire, Inc.*, 641 F.3d 1011, 1020 (8th Cir. 2011). "Direct evidence of retaliation is evidence that demonstrates a specific link between a materially adverse action and the protected conduct, sufficient to support a finding by a reasonable fact finder that the

harmful adverse action was in retaliation for the protected conduct." *Id.* (citation omitted).

Absent direct evidence, a plaintiff must establish a prima facie case of retaliation, which "requires a showing that (1) the plaintiff engaged in statutorily protected activity, (2) an adverse employment action was taken against him, and (3) there is a causal connection between the two events." *Keefe v. City of Minneapolis*, 785 F.3d 1216, 1224-25 (8th Cir. 2015). "[I]f the plaintiff is able to establish a prima facie retaliation case, the defendant must provide a legitimate, nondiscriminatory reason for its decisions. If the defendant is able to do so, the burden shifts back to the plaintiff to show that the proffered reason was merely a pretext for discrimination." *Id.* In short, "[t]he plaintiff in a retaliation case must present sufficient evidence for a reasonable jury to conclude that her protected conduct was a determinative factor in a materially adverse employment action taken by the employer." *Hervey v. Cty. of Koochiching*, 527 F.3d 711, 722 (8th Cir. 2008).

Similarly, "[t]o establish a prima facie case of retaliation under the MHRA, a plaintiff must prove (1) he complained of discrimination; (2) the employer took adverse action against him; and (3) a causal relationship existed between the complaint and the adverse action." *Denn*, 816 F.3d at 1036 (citing *McCrainey v. Kansas City Mo. Sch. Dist.,* 337 S.W.3d 746, 753 (Mo. Ct. App. 2011)). A "causal relationship" exists under the MHRA "when retaliation was a contributing factor to the adverse action." *Id.* (citations omitted).

Here, Plaintiff has presented neither direct evidence of retaliation nor sufficient evidence to establish a causal relationship between Defendants' challenged actions and any protected activity. As an initial matter, the Court agrees with Defendants that Plaintiff's September 15, 2013 letter was not a protected complaint of race discrimination. The letter did not reference discrimination based on the race of Plaintiff's partner—in fact, Plaintiff did not even mention the race of his partner in the letter. *See Hunt v. Neb. Pub. Power Dist.*, 282 F.3d 1021, 1028-29 (8th Cir. 2002) (finding that the plaintiff did not engage in protected activity for the purpose of her federal retaliation claim where she complained that her employer failed to give her a raise or a promotion, but did not attribute this failure to sex discrimination); *Shore v. Children's Mercy Hosp.*, 477 S.W.3d 727, 735 (Mo. Ct. App. 2015) (holding that an employment complaint that did not reference a type of prohibited discrimination could not give rise to an MHRA retaliation claim).

Rather, the record reflects that Plaintiff's first complaint of discrimination based on the race of his partner was in his charge of discrimination filed with the MCHR and the EEOC. That charge was not filed until December 6, 2013, and the only adverse employment actions that Defendants took against Plaintiff after that time were, on December 17, 2013, to send letters to UMSL and the other institutions where Plaintiff taught as a SLIA representative, informing them that SLIA was no longer affiliated with

Plaintiff and would revoke his visa sponsorship,[6] and, on February 20, 2014, to formally terminate Plaintiff and revoke his visa sponsorship.

Although Defendants sent their letters to UMSL and the other institutions very shortly after Plaintiff filed his charge of discrimination, "[g]enerally, more than a temporal connection between the protected conduct and the adverse employment action is required to present a genuine factual issue on retaliation." *Kiel v. Select Artificials, Inc.*, 169 F.3d 1131, 1136 (8th Cir. 1999); *see also Williams v. Trans States Airlines, Inc.*, 281 S.W.3d 854, 869 (Mo. Ct. App. 2009) (same under MHRA).

> The wisdom of this rule is evident in a case . . . where the employee was accused of insubordination *before* she notified the employer of her protected activity. Insubordinate employees may not insulate themselves from discipline by announcing an intention to claim discrimination just before the employer takes action. Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity.

*Hervey*, 527 F.3d at 723; *see also Denn*, 816 F.3d at 1036 (holding that where an employer had sought approval to deliver a warning to an employee nearly a month before, because of the employee's history of performance issues, the employee's "receipt of a final warning days after his complaint was a 'mere coincidence of timing' that fail[ed] to give rise to a factual issue [under the MHRA] regarding whether the complaint was a factor contributing to the delivery of this warning").

---

[6] The Court is assuming, for purposes of Plaintiff's motion, that the delivery of letters to these institutions constitutes an adverse employment action under § 1981 and the MHRA.

That is precisely the case here.  Defendants presented Plaintiff with the Memorandum of Understanding, warning him that failure to comply would result in termination and revocation of his visa sponsorship, before Plaintiff filed his charge of discrimination and based on Plaintiff's prior behavior.  The mere fact that Plaintiff immediately thereafter filed his charge of discrimination—before Defendants had a chance to send the letters announcing their decision to terminate him or to formally terminate him—did not insulate him from termination and is insufficient to create a reasonable inference of retaliation.[7]  *Hervey*, 527 F.3d at 724; *Denn*, 816 F.3d at 1036.  Because Plaintiff has failed to produce sufficient evidence to support a reasonable inference that his charge of discrimination was a factor contributing to the adverse actions alleged here, he has failed to show a genuine dispute for trial.  Moreover, even if the Court assumed that Plaintiff could establish a prima facie case of retaliation under § 1981, he has failed to show pretext.  Therefore, the Court will grant Defendants' motion for summary judgment on Plaintiff's § 1981 and MHRA retaliation claims.

---

[7]     The Court notes that, in addition to referencing Plaintiff's history of problematic behavior, Defendants' February 20, 2014 termination letter also mentions the allegedly inappropriate social media messages that Defendants sought out and discovered only after Plaintiff filed his charge of discrimination.   However, Defendants' termination letter states that they considered the messages "of no consequence" in light of Plaintiff's prior abandonment of his job duties.  The Court does not find this reference sufficient to create a reasonable inference of a retaliatory motive.

## <u>CONCLUSION</u>

For the reasons set forth above,

**IT IS HEREBY ORDERED** that Defendants' motion for summary judgment is

**GRANTED**.  (Doc. No. 38.)

All claims against all parties having been resolved, a separate Judgment shall

accompany this Memorandum and Order


_____
AUDREY G. FLEISSIG
UNITED STATES DISTRICT JUDGE

Dated this 3rd day of August, 2016.